ams/sl

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| INFOHAND CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-2056-JAR |
| | ) | |
| SPRINT SPECTRUM, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Infohand Co., Ltd. ("Infohand") filed this diversity action for breach of contract against defendant Sprint Spectrum, L.P. ("Sprint"), alleging that it breached an agreement they made whereby Infohand would manufacture cameras for certain models of Sprint cellular phones.  Now before the Court is Sprint's Motion for Summary Judgment (Doc. 34).  The motion is fully briefed and the Court is prepared to rule.  As described more fully below, Sprint's motion for summary judgment is granted in part and denied in part.

**I. Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome

---

[1]Fed. R. Civ. P. 56(c).

of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[8]  When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[9]

---

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

[4] *Id.* at 251–52.

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[7] *Id.*

[8] *Id.*

[9] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## II. Uncontroverted Facts[10]

In early 2002, Sprint and Infohand entered into a Master Purchase Agreement for Subscriber Equipment and Related Services ("MPA") whereby Sprint would purchase cameras manufactured by Infohand for use with certain models of Sprint mobile wireless telephones.  The cameras developed by Infohand could be attached to the Sprint phones via a cable and would allow users to share pictures taken with the cameras over Sprint's wireless mobile communications services network.  A Sprint customer using the Infohand camera with his phone would be able to take pictures with the camera, upload the pictures from the camera to his Sprint phone via the attachment cable and then transfer the pictures into his Sprint picture account, allowing him to share the pictures with others.  At the time that the parties formed the MPA, Sprint did not yet sell cameras integrated into mobile wireless phones.

The MPA was an extensive written agreement that covered a range of subjects such as delivery, pricing, risk of loss, returns, acceptances, notices, product changes, and modifications. As part of the MPA, the parties committed to the sale of thousands of units of the cameras. Infohand committed that it would be able to provide Sprint with at least 75,000 units of the camera during each relevant calendar month; and Sprint committed to purchase cameras from Infohand in accordance with purchase orders that it would submit to Infohand from time to time and agreed that it could be penalized if it failed to act in compliance with a particular purchase order.

---

[10]Sprint's reply memorandum was filed out of time and will not be considered by the Court.  *See* D. Kan. R. 6.1(d)(2) (providing 23 days from the date of service of the response).  However, even if the Court considered this brief as timely filed, it would not affect the Court's findings of uncontroverted facts nor its decision on the motion.

On November 21, 2002, Sprint ordered 150,000 cameras from Infohand at a price of $45.00 each for a 2003 Valentine's Day promotion. The cameras for the Valentine's Day promotion were purchased pursuant to a single purchase order and were to be delivered in several stages beginning on January 16, 2003 and ending on February 17, 2003. Infohand timely completed the delivery of all 150,000 cameras to Sprint. The cameras at issue were delivered to Sprint as follows:

       a.       27,000 cameras delivered on February 1, 2003;

       b.       20,000 cameras delivered on February 10, 2003;

       c.       2,506 cameras delivered on February 15, 2003;

       d.       16,997 cameras delivered on February 17, 2003;

       e.       2,540 cameras delivered on February 19, 2003..

On January 29, 2003, Alex Kim of Infohand sent Kim Glenn of Sprint an e-mail advising that Infohand had been working on improving the image quality of its camera and was planning to apply the improvement to the next shipment of cameras to Sprint. Glen responded by e-mail that she looked forward to seeing the improvements. Although not mentioned in the January 29 e-mail, the image quality improvement to which Alex Kim had referred was the replacement of the original image processing chip in the camera, manufactured by third-party manufacturer Agilent, with a new image processing chip developed by Infohand. The purpose of the image processor in the Infohand camera was to compress the image and take up less memory. All cameras prior to this date contained the Agilent image processing chip and all cameras shipped on and after January 30, 2003 contained the new Infohand-developed image processing chip. Infohand shipped Sprint a total of 69,043 cameras containing the Infohand-developed image processing chip.

4

On March 1, 2003, twelve days after completing delivery of all cameras for the Valentine's Day promotion purchase order, Samuel Kim of Infohand sent an e-mail to Sprint explaining that the 69,097 cameras[11] with the Infohand image processing chip had uploading failures and asked Sprint to block distribution of the defective cameras.  The ability to upload the pictures from the camera to the customer's picture account, enabling the customer to store, view, and share the pictures, was a key feature of the product.  Samuel Kim apologized for the problem and offered to come to Sprint's offices in Kansas to discuss a possible cure for the defective cameras.  Other than Alex Kim's earlier e-mail that Infohand would be applying an image quality improvement, the March 1 e-mail was the first time Sprint learned that Infohand had changed the image processor and that the new Infohand image processor did not work.  Before shipping the 69,043 cameras at issue, Infohand did not disclose to Sprint that it had developed a new image processor nor that it would be applying the new image processor to some of the cameras.

Sprint met with Samuel Kim at Sprint's office on March 4, 2003.  At the meeting, Samuel Kim advised Sprint that the cameras at issue could be cured within two weeks.  Sprint then asked Samuel Kim to ship ten cameras to Sprint that contained the Infohand-developed image processing chip with the proposed cure for the uploading failure.  The ten cameras were shipped to Sprint on March 7, 2003 and on that same day, Sprint sent Infohand a letter stating that it was rejecting all cameras shipped under the Valentine's Day promotion purchase order.  Sprint subsequently returned the cameras to Infohand.

---

[11]There is some confusion surrounding the exact number of cameras at issue.  Alex Kim's email identified 69,097 total cameras affected by the image processing chip change.  *See* Doc. 35, Ex. L.  This number is also specified in the briefs and Pretrial Order as the total quantity of cameras shipped.  However, the itemized list of cameras shipped only amounts to 69,043.  The parties also stipulate that this itemization is correct.  It appears that Alex Kim's math was not correct in the March 1 email and the correct number of cameras in dispute is 69,043.

### III.  Analysis

#### A.  *Breach of Implied Duty of Fair Dealing*

For the first time in its response memorandum, Infohand raises a claim that Sprint breached its implied duty of good faith and fair dealing.  This claim does not appear in the Complaint, nor in the Pretrial Order that was issued before Infohand's response memorandum was filed.  The Pretrial Order supersedes all pleadings and controls the subsequent course of the case.[12]  The Pretrial Order is typically prepared by the parties and "measures the dimensions of the lawsuit, both in the trial court and on appeal."[13]  Given this purpose, "attorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be."[14]  The Tenth Circuit has held that if an issue is not included in the Pretrial Order, it is not part of the case before the district court.[15]  Under the section of the Pretrial Order labeled "List of Plaintiff's Theories of Recovery," Infohand only stated a claim under the theory of breach of contract.[16]  Further, Infohand has not filed a motion to modify the Pretrial Order. Because this issue is not part of Infohand's case, the Court declines to consider it on its merits.

#### B.  *Breach of Contract*

Sprint argues that Infohand delivered defective cameras, entitling it to reject without any obligation to allow Infohand an opportunity to cure under the MPA; therefore, there was no

---

[12]*See* Fed. R. Civ. P. 16(e); D. Kan. R. 16.2(c).

[13]*Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003) (quoting *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997)).

[14]*Id.* (quoting *Rios v. Bigler*, 67 F.3d 1543, 1549 (10th Cir. 1995)).

[15]*Id.* (quoting *Gowan v. United States Dep't of Air Force*, 148 F.3d 1182, 1192 (10th Cir. 1998)); *see also Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2005).

[16](Doc. 35 at 6.)

breach of contract.  In contrast, Infohand alleges that Sprint breached the MPA by not either allowing Infohand the opportunity to cure the defect or paying for the products.  The elements for a breach of contract claim are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) damages due to the breach.[17]  Here, the parties dispute the proper interpretation of certain provisions of the MPA and therefore, dispute whether there is a genuine issue of material fact about whether the contract was breached.

Under Kansas law,[18] the construction and interpretation of a written contract is a matter of law for the court.[19]  "'In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms.'"[20]  The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.[21]  Where a contract is complete and unambiguous on its face, the court must determine the intent of the parties from the four corners of the document, without regard to extrinsic or parole evidence.[22]

---

[17]*Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).

[18]The MPA explicitly provides that Kansas law governs the contract and neither party disputes that Kansas law applies.

[19]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994).  Further, the written contract itself controls the sale of goods and the Uniform Commercial Code only applies insofar as the contract is silent on a given issue.  *See* K.S.A. §§ 84-1-102 (3), 84-2-719.

[20]*Id.* (quoting *Barnett v. Oliver*, 672 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[21]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (citing *Hollenbeck v. Household Bank*, 829 P.2d 903, 903–06 (Kan. 1992)).

[22]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

Whether a contract is ambiguous is also a question of law for the court.[23]  "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."[24]  "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning."[25]  "The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists."  The Court is to use common sense and not strain to create an ambiguity in a written instrument when one does not exist.[26]  The fact that the parties do not agree over the meaning of terms does not in and of itself prove that the contract is ambiguous.[27]

## 1.  Defect

It is uncontroverted that the cameras did not work properly due to the uploading failure caused by the Infohand-developed image processing chip.  Infohand argues that a material factual issue remains as to whether the cameras were in material nonconformance with the MPA and, thus, defective under section 1.0.  Section 1.0 of the MPA defines "defect" or "defective" as:

---

[23]*Simon*, 829 P.2d at 888.

[24]*Id.*

[25]*Id.* (citing *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 810 P.2d 283, 284 (Kan. 1991)).

[26]*Eggleston v. State Farm Mut. Auto. Ins. Co.*, 906 P.2d 661, 662 (Kan. Ct. App. 1996), *rev. denied*, 261 Kan. 1086 (1997).

[27]*Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996), *rev. denied*, 261 Kan. 1086 (1997).

(1) any defectiveness that is not the direct result of, or directly attributable to, Sprint's act or omission and (2) any one or a combination of the following, or items of a similar nature:
(a) when used with respect to the performance of Services (including work by any InfoHand Personnel), items that are not provided in accordance with the Specifications;
(b) when used with respect to materials and Products (including work by any InfoHand Personnel), items that are not; (i) of good quality, free from improper workmanship, or in accordance with the Specifications; or (ii) free from errors and omissions in Product design such that the Product contains defects classified as to their level of severity as "S0", "S1", or "S2" as defined by the InfoHand Defect Classification Procedure included as part of this Agreement as Exhibit N; or
(c) in general: (i) work (including work by any InfoHand Personnel) that does not conform to the Specifications or requirements of this Agreement or both; (ii) work (including work by any InfoHand Personnel) that is not free from excessive corrosion or erosion; or (iii) any design, engineering, materials, Products, tools, supplies or training that does not conform to the Specifications or has improper or inferior workmanship.

The Court does not find that the above language is ambiguous.  Regardless of the reasoning that Sprint gave to Infohand as to why it rejected, the cameras did not function properly.  Infohand argues that the substitution of the Agilent chip is not a "material departure" from the parties' Agreement, but instead that it was fulfilling its "ongoing duty to improve the image quality of the camera."  The standard under section 1.0 is not whether there was a material departure from the parties' agreement.  It is undisputed that the problem with the cameras could not be attributed to Sprint and that the new processor did "not conform to the Specifications or ha[d] improper or inferior workmanship."  Under the plain language of section 1.0, there is no genuine issue of material fact about whether the cameras were defective.

## 2.  Acceptance and Rejection

The parties next dispute whether Sprint accepted the cameras under the terms of the MPA.  Section 10.1 of the MPA provides:

> Acceptance will occur after: (i) Sprint submits to InfoHand an acceptance certificate stating that the Product complies with this Agreement and the Purchase Order; or (ii) the expiration of the longer of (a) 20 days after delivery of the Product, unless Sprint notifies InfoHand of its rejection within that 20 day period, or (b) any longer time period specified in a Schedule.  Applicable Schedules or Purchase Orders detail the agreed to acceptance tests, if any, including which party is responsible for the performance and costs of the acceptance tests, and the acceptance time periods, if longer than 20 days after delivery of the Product or System.

Sprint notified Infohand of its rejection of all 69,043 defective cameras on March 7, 2003.

Sprint argues that because this rejection came less than twenty days after the final shipment of

the purchase order, the rejection is effective as to all the defective cameras.  But to reach this

conclusion Sprint interprets the twenty-day period in section 10.1 to begin only after the entire

purchase order is delivered, not after each individual delivery.

The unambiguous terms of section 10.1 clearly apply to each individual delivery of

cameras and not to each series of deliveries under a purchase order.  Under this section, Sprint

may accept products by *either* submitting an acceptance certificate *or* by allowing twenty days

from "delivery of the Product" to expire, or any other period specified in a Schedule.  The plain

language of this section read in conjunction with the entire contract is that the acceptance

process applies to each individual delivery of cameras, not the delivery of the purchase order as a

whole.  First, the word "final" does not appear before delivery in section 10.1.  Further, the

MPA clearly distinguishes between the terms "purchase order" and "delivery."  In section 10.1,

both terms are present, yet the twenty-day time period explicitly states that it runs from the

delivery of the Product.  Since it is uncontroverted that there is no acceptance certificate, nor an

agreement between the parties that governed acceptance, the twenty-day expiration of time

applied to the delivery of the cameras.  Thus, any delivery received more than twenty days

before the March 7, 2003 rejection letter was accepted, while any delivery received within

twenty days of that letter was not accepted.

Because 49,506 of the cameras in question were delivered on or before February 15,

2003—twenty days prior to the March 7, 2003 rejection letter—these cameras were accepted

according to section 10.1 of the MPA.  As to the 19,537 cameras in the last two deliveries, these

cameras were not accepted by Sprint because the March 7 rejection letter was within the twenty

day period allowed under section 10.1.

**3.  Right to Cure**

Now that it has been determined that Sprint accepted the first three shipments of cameras

and rightfully rejected the last two shipments, the Court must address whether Infohand had a

right to cure any or all of the cameras.  The MPA contained a warranty provision that continues

for ninety days from the date of the end user's purchase of the product.  During this warranty

period, Sprint had a contractual right to return any defective cameras.  Section 8.2. titled "Return

and Repair of Defective Products," provides:

> During any applicable warranty period, InfoHand will allow Sprint
> to return any Defective Products to any of InfoHand's designated
> repair facilities for service by InfoHand.  InfoHand will, within 20
> days after receipt of a Defective Product, at Sprint's option: (i)
> provide a credit to Sprint for the Net Price of the Defective
> Product; (ii) refund to Sprint the Net Price of the Defective
> Product; (iii) send, at InfoHand's sole expense, a new replacement
> Product directly to Sprint or Sprint's designated agent; or (iv)
> send, at InfoHand's sole expense, a repaired or reconditioned
> replacement Product directly to Sprint's designated agent.  Any
> Products which are determined to be sent to InfoHand in
> error—e.g. are functional products with "No Trouble Found"
> (NTF)— will be shipped back to a designated Sprint warehouse at
> Sprint's expense.

This provision is unambiguous and allowed Sprint the option to return the accepted defective cameras and receive among other things, a credit for the purchase price.  There is no genuine issue of material fact that under the plain language of section 8.2 of the MPA, Sprint rightfully returned the first three deliveries (Feb. 1, 10, and 15) and was neither entitled to pay for these deliveries nor required to allow Infohand to cure the defective cameras from these first three deliveries.  Sprint accepted the first three deliveries and rightfully returned those 49,506 cameras pursuant to section 8.2 of the MPA and its summary judgment motion is granted as to these cameras.

However, Infohand did have a right to cure the cameras which had not yet been accepted by Sprint (the last two deliveries).  This is supported by Section 10.2 of the MPA which states:

> If the Product does not meet the acceptance criteria set forth in Section 10.1, Sprint will inform InfoHand of the specific failures that gave rise to the rejection and require InfoHand to cure the failures within 30 days of the rejection or replace the Product with conforming Product.  If after the 30 day cure period has expired, the Product still does not meet the acceptance criteria set forth in Section 10.1, Sprint may: (i) suspend or cancel any existing or future Purchase orders for the same or similar Product; or (ii) obtain replacement product and require InfoHand to pay Replacement Costs.  Limitations of liability are set forth in Section 25 below.

Sprint argues that this provision does not support the conclusion that Infohand had the right to cure those cameras which were not yet accepted.  Sprint states that section 10.2  must be read in conjunction with section 10.1, which provides that one way in which Sprint can accept is by issuing an acceptance certificate and that section 10.2 applies if Sprint had accepted by issuing an acceptance certificate.  Sprint argues that because it did not issue an acceptance certificate, Infohand is not entitled a right to cure under section 10.2.

The Court does not find Section 10.2 ambiguous and applies its plain meaning to the facts of this case.  Section 10.2 specifically refers to "acceptance criteria set forth in section 10.1," yet, the term "acceptance criteria" does not appear in Section 10.1.  As already discussed, Section 10.1 provides for two alternatives for acceptance: an acceptance certificate or the expiration of a certain amount of time.  "Acceptance criteria," in section 10.2 plainly refers to either mode of acceptance discussed in the previous section.  Sprint did not issue acceptance certificates for the deliveries, nor did it agree to a time period other than twenty days from delivery to allow for rejection, so the only relevant "acceptance criteria" at issue is the expiration of twenty days from delivery.  As already discussed, Sprint rightfully rejected the last two shipments of cameras under section 10.1 and, as such, those cameras failed to meet the acceptance criteria.  Under section 10.2, Sprint was required to inform Infohand of the failures that gave rise to that rejection and was required to give Infohand a thirty-day period in which to cure the defects.  Sprint did not allow Infohand its right to cure these 19,537 cameras.  Because there is no genuine issue of material fact that Infohand had a contractual right to cure these cameras, Sprint's summary judgment motion is denied as to these cameras.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 34) is **granted in part and denied in part**.  The motion is granted with regard to the first three product shipments at issue and denied with regard to the last two shipments.

**IT IS SO ORDERED**.

Dated this 18th day of December 2006.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

13